

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00126-CV
_____


IN THE INTEREST OF A.M., A CHILD



On Appeal from the County Court at Law
Lamar County, Texas
Trial Court No. 92715



Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

In this accelerated appeal, Father and Mother[1] challenge the trial court's order terminating their parental rights to their child, A.M. The trial court terminated Father's parental rights under grounds E and N and terminated Mother's parental rights under ground P. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (N), (P) (Supp.). The trial court found that termination of Father's and Mother's parental rights was in the child's best interests. A.M. was removed due to allegations of sexual abuse by her Guardian. Both parents were incarcerated at the time of A.M.'s removal and throughout the pendency of the case. Father challenges the sufficiency of the evidence to support grounds E and N, while Mother challenges the best-interest finding. Because the record contains legally and factually sufficient evidence supporting the trial court's findings, we affirm the termination of Father and Mother's parental rights of A.M.

## I.      Standard of Review and Applicable Law

"The natural right which exists between parents and their children is one of constitutional dimensions." *D.V. v. Tex. Dep't of Fam. & Protective Servs.*, 722 S.W.3d 854, 858 (Tex. 2025) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "The Texas Supreme Court has acknowledged that there is a debate about the *source* of the parental rights but has held that the *existence* of those rights is beyond debate." *In re C.C.*, 720 S.W.3d 41, 51 (Tex. App.—Texarkana 2025, no pet.) (citing *Stary v. Ethridge*, 712 S.W.3d 584, 588 n.6 (Tex. 2025) ("Debates regarding the precise textual sources of that well-recognized right are not at issue here.")).

---

[1]We use the child's initials and pseudonyms for the parents to protect the identity of A.M. *See* TEX. R. APP. P. 9.8(b), 9.8 cmt; *see* TEX. FAM. CODE ANN. § 109.002(d) (Supp.).

Nonetheless, though "parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

"The State's fundamental interest in parental-rights termination cases is to protect the best interest of the child." *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003). "The interests of the child and the State are typically expressed as being an inherent part of the analysis of the parent's rights." *In re C.C.*, 720 S.W.3d at 53 (citing *In re J.W.*, 645 S.W.3d 726, 753 (Tex. 2022) (Young, J., concurring) ("[T]he very sanctity of the parent-child relationship entails the need for an escape hatch if things go terribly wrong." (alteration in original))).

Due to the constitutional nature of the parties' interests, "the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *D.V.*, 722 S.W.3d at 858 (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)) (citing TEX. FAM. CODE ANN. § 161.001(b)). And due to the heightened burden of proof at trial, "[p]arents also benefit from an otherwise-inapplicable elevated standard of appellate review." *Id.* (citing *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam)).

On appellate review, we are tasked with "undertak[ing] 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26). "[T]he appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d

3

at 25. Both legal and factual sufficiency review deal with whether "a reasonable factfinder could form a firm belief or conviction," but there is a difference between legal and factual sufficiency. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018).

> For legal sufficiency, the review is as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630. "In conducting a *legal*-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but [it] must otherwise *assume the factfinder resolved disputed facts in favor of the finding*." *Id.* at 630–31 (emphasis added).

By comparison,

4

[f]actual sufficiency . . . *requires weighing disputed evidence contrary to the finding* against all the evidence favoring the finding. In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true.

*Id.* at 631 (emphasis added) (footnote omitted) (citation omitted). Under this approach, "[t]he assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020).

However, rather than "disregard[ing]" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true.

*Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "This standard of appellate review announced in 2002 remains the law." *In re C.C.*, 720 S.W.3d at 54 (citing *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quoting *In re C.H.*, 89 S.W.3d at 25)).

"Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence." *In re R.R.A.*, 687 S.W.3d at 279 n.50. "Such inferences must be reasonable and based on other facts proved." *Id.* "Our opinion does not render the clear-and-convincing-evidence standard toothless; instead, it properly defers credibility determinations to factfinders at the trial court level, who most closely interact with the witnesses." *Id.* at 279.

Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam) (quoting *In re N.G.*, 577 S.W.3d at 232). Grounds D and E deal with child endangerment. *In re R.R.A.*, 687 S.W.3d at 277. Termination on grounds D or E "has consequences for termination of parental rights as to children in a future proceeding." *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam); *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (Supp.). Therefore, "due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704; *see In re J.W.*, 645 S.W.3d at 748 ("[W]e may not bypass [Father's] evidentiary challenges to Subsections (D) and (E), the so-called endangerment grounds.").

Appellate review of termination on endangerment grounds must be conducted in a "holistic" fashion. *In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (per curiam) (orig. proceeding) ("reaffirm[ing] the holistic endangerment review set forth in [*In re*] *R.R.A.*"). The approach to endangerment review set forth in *In re R.R.A.* is not limited to drug use. *In re N.L.S.*, 715 S.W.3d 760, 764 (Tex. 2025) (per curiam) ("Father argues that [*In re*] *R.R.A.* is limited to drug-use cases. That is incorrect."). Consequently, we review endangerment findings considering the "aggregate weight" of factors supported by the evidence. *In re R.R.A.*, 687 S.W.3d at 281 (finding that termination on grounds D and E was supported by "the aggregate weight of Father's

6

ongoing drug use, homelessness, employment instability, and near-complete abandonment of his child[] for the six months preceding trial").

## II.    Applicable Facts

A.M. was twelve years old at the time of trial.  She had lived most of her life with Guardian because Father and Mother were incarcerated.[2]  A.M. was removed from Guardian due to allegations of sexual abuse.

After removal, A.M. went through five different placements.  She was placed in several family placements, but those broke down.  A.M. was in a residential treatment center for eight months prior to Father's trial.  During Father's trial, Ashley Adame, a permanency specialist with 4Kids4Families, reported that A.M. was "struggling right now" and was receiving therapy services.  Tammy Sulsar, a court appointed special advocate (CASA), testified that A.M., though initially reluctant to discuss adoption, had begun discussing what sort of adoptive parents she would like to have.

During Mother's trial, Kim Rankin, a permanency specialist supervisor with 4Kids4families, testified that A.M. was "doing well" in her placement.  Rankin relayed that A.M. told Rankin that, "if her parents' rights were terminated that's on them."

Father and Mother have been repeatedly incarcerated throughout A.M.'s life.  During the pendency of this case, both parents were incarcerated for drug-related offenses.  Father was incarcerated during a proceeding that gave Guardian custody of A.M.  Father later spent time in federal custody from early 2016 until April 2021, and was then taken back into custody after

---

[2]Guardian was given custody through a previous suit when Father and Mother were both incarcerated.  Guardian is not biologically related to any party.

committing the offense of possession of a controlled substance in October 2023. At the time of his trial, Father was being held on a federal supervised release violation and expected to be released in April 2026, followed by time in a halfway house until June 2026. Mother received a ten-year sentence on a revocation for possession of a controlled substance with intent to distribute in a drug-free zone with a projected release date in June 2032 and was not parole eligible for at least nineteen months after the conclusion of her trial in this matter.

Adame testified that she created a family service plan (FSP) for Father, and Rankin testified that an FSP was created for Mother, both tailored for incarcerated parents. Father did not complete all of his services, and Mother did not take advantage of the available services, did not request parenting or substance-abuse packets if the facility did not offer services, and responded to only a portion of Adame's correspondence.

Throughout A.M.'s life, Father and Mother had little contact with her. Father had not attempted any contact with A.M. for at least eight months before his trial, and they had no relationship. Father testified that he attempted to contact A.M. through his mother and another daughter of his, but he was told he could not contact A.M. and believed that meant he could not have any contact with A.M. Mother does not have a bond with A.M.

The trial court terminated Mother's rights under ground P[3] and Father's rights under grounds E and N, and found that termination of both parents' parental rights was in A.M.'s best interests.[4]

---

[3]The State originally pled ground Q in its petition, but the Texas Legislature subsequently amended the statute to relocate ground Q to ground P. *See* TEX. FAM. CODE ANN. § 161.001(b)(1).

### III. Regarding Father, Legally Sufficient Evidence Supports Ground E

In his first issue, Father challenges the legal and factual sufficiency of the evidence supporting termination of his parental rights under ground E. He argues that the Texas Department of Family and Protective Services relied only on his lengthy incarceration without linking that incarceration to an act, omission, or failure to act causing endangerment.

#### A. Applicable Law

Ground E permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Ground E examines endangering conduct by the parent or others. *Id.* "[T]ermination under (E) requires that a parent's conduct endanger the child's physical or emotional well-being." *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024) (per curiam).

As used in the parental-rights termination statutes, "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted). "Although "'endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment,' it does not require that there be conduct 'directed at the child' or that 'the child actually suffer[] injury.'" *In re J.W.*, 645 S.W.3d at 748 (alteration in original) (quoting *Boyd*, 727 S.W.2d at 533). "The endangering conduct may also occur 'either before or after the child's removal by the Department.'" *In re Y.B.*, No.

---

[4]A separate trial was held for each parent, with Father's taking place on November 13, 2025, and Mother's on December 1, 2025.

06-25-00049-CV, 2025 WL 2885861, at *4 (Tex. App.—Texarkana Oct. 10, 2025, no pet.) (mem. op.) (quoting *In re R.G.*, No. 06-24-00035-CV, 2024 WL 4142842, at *5 (Tex. App.—Texarkana Sept. 11, 2024, no pet.) (mem. op.)).

> In *Texas Department of Human Services v. Boyd*, we acknowledged that "Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," but we nevertheless held that incarceration does support an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child."

*In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533–34). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists–can support a finding of endangerment." *Id.* at 313. "Imprisonment thus 'is certainly a factor' the trial court may weigh when considering endangerment." *Id.* (quoting *Boyd*, 727 S.W.2d at 533). "Lengthy incarceration presents a risk of endangerment to the child's well-being—such a significant risk, in fact, that the Legislature provides for the pre-emptive termination of parental rights, even before the risk associated with incarceration manifests itself." *Id.* at 314. "We expressly have held that a conviction can be 'a relevant factor in establishing an endangering course of conduct' under subsection (E)." *Id.* (quoting *In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012)). "[U]nder that provision, the mere fact of a conviction will not support termination." *Id.* at 315. "Nor does a crime become conclusive evidence of 'endangering' conduct because it results in incarceration." *Id.* "But such evidence . . . together with the duration and consequences of the

incarceration, is relevant when the resulting abandonment presents a risk . . . to a child's physical or emotional well-being." *Id.*

"[W]e may also consider a parent's failure to complete relevant requirements of a family service plan." *In re Y.B.*, 2025 WL 2885861, at *4.

**B.      Analysis**

Father testified that he was incarcerated during the 2015 custody proceedings for a parole violation on a burglary-related offense and was later imprisoned in federal custody for six years. Two years after his release, he was incarcerated in a Texas state-jail facility at the time of A.M.'s removal and was then imprisoned again for a parole violation on his previous federal offense. This repeated criminal conduct exposed A.M. to the loss of a stable home and the emotional harm of continuing parental absence.

In *In re J.F.-G.*, the Texas Supreme Court emphasized that the father "did not stop engaging in criminal activity after [the child] was born, when he would (or should) have been aware that criminal conduct . . . risked separating him from [the child] for years, as, in fact, it did," and noted that the duration of his imprisonment, which was more than eight years, was "[p]articularly significant." *In re J.F.-G.*, 627 S.W.3d at 315.   The Texas Supreme Court concluded there was sparse evidence that the father supported the child's physical or emotional well-being, and his omissions throughout the child's life exposed her to physical and emotional loss because he did not care for, nurture, or protect her. *Id.*  The Texas Supreme Court held that the record "support[ed] the trial court's implied finding that [the] father was not a presence or source of support in [the child's] life." *Id.*  "[Father's] lack of knowledge resulted from criminal

11

conduct that led to his incarceration and his indifference to his daughter while he was incarcerated." *Id.* at 315.

"We note, specifically: [Father's] absence from [A.M.'s] childhood for more than eight years; his history of [drug-related offenses]; his choice not to monitor her safety during his incarceration; and his minimal effort to contact [her] or be part of decisions regarding her health, education, or well-being." *Id.* at 317–19. "[T]he record . . . supports the trial court's implied finding that [A.M.]'s father was not a presence or source of support in her life." *Id.* at 316.

Here, the trial court could have reasonably reached the same conclusion that Father's repeated absence endangered A.M.'s emotional and physical well-being. *See J.F.-G.*, 627 S.W.3d at 315–16. A.M. lived most of her life with Guardian, where she was sexually abused, during periods when Father's criminal conduct had removed him from her life and left him unable to monitor A.M.'s safety or provide day-to-day care. Adame reported that A.M. was "struggling right now," and she was receiving "trauma therapy, as well as sexual-trafficking treatment." Sulsar testified that, though offered several times to write letters to her parents, A.M. had always declined.

Given Father's pervasive criminal history, which repeatedly caused his absence from A.M.'s life, a reasonable fact-finder could form a firm belief or conviction that Father engaged in a course of conduct that endangered A.M.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re J.F.-G.*, 627 S.W.3d at 312–16. After an exacting review of the entire record, under the legal and factual review principles set forth above, and with a healthy regard for the constitutional interests at stake, we find that the trial court could have

reasonably formed a firm belief or conviction that termination of Father's parental rights on ground E was warranted. *See In re J.F.C.*, 96 S.W.3d at 266. Regarding factual sufficiency, the disputed evidence contrary to the ground E finding is not so significant that the trial court could not have reasonably formed a firm belief or conviction that termination of Father's parental rights was warranted. *See id.* at 266–67. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's ground E finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

We overrule Father's first issue.

## IV.    Legally Sufficient Evidence Supports Ground N

In his second issue, Father challenges the legal and factual sufficiency of the evidence supporting termination of his parental rights under ground N. He only challenges that the Department failed to present sufficient evidence establishing that he failed to "regularly visit[] or maintain[] significant contact with the child."

### A.    Applicable Law

> To terminate parental rights under subsection (N), the Department must establish that (1) the child has been in the permanent or temporary managing conservatorship of the Department for not less than six months; (2) it has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment.

*In re G.M.M.*, 721 S.W.3d 679, 683–84 (Tex. App.—San Antonio 2025, no pet.) (citing TEX. FAM. CODE ANN. § 161.001(b)(1)(N)). "The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct." *In re J.A.*, No. 04-20-00242-CV, 2020 WL 5027663, at *2 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (mem. op.) (quoting

13

*In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.)). "A parent fails to regularly visit or maintain significant contact with the child if the parent fails to take advantage of the visitation rights or if the visits are intermittent or sporadic." *In re J.I.P.*, No. 04-20-00549-CV, 2021 WL 1269913, at *3 (Tex. App.—San Antonio Apr. 7, 2021, no pet.) (quoting *In re S.S.*, 11-05-00083-CV, 2006 WL 1285125, at *3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.)).

"A parent's incarceration, standing alone, is not constructive abandonment." *See In re G.A.M.*, No. 04-19-00710-CV, 2020 WL 690646, at *4 (Tex. App.—San Antonio Feb. 12, 2020, pets. denied (mem. op.)). "Although incarceration may render it difficult for a parent to maintain significant contact with a child, it is not impossible." *In re G.M.M.*, 721 S.W.3d at 684. "While the child may not be able to live with the parent in a jail cell, it would seem that the parent could nonetheless pursue a significant relationship with the [child] through, at the very least, written correspondence." *In re D.S.A.*, 113 S.W.3d 567, 574 (Tex. App.—Amarillo 2003, no pet.).

### B.    Analysis

Father argues that he "ma[d]e efforts to contact A.M. while incarcerated but believed he was prevented from doing so while the termination proceedings were in place." Father relies on *In re D.T.*, 34 S.W.3d 625 (Tex. App.—Fort Worth 2000, pet. denied), to argue that his subjective belief that he was prevented from contacting A.M. should excuse his lack of contact. However, the facts of *In re D.T.* are significantly different from those presented here. *See id.* In *In re D.T.*, the incarcerated parent made "numerous written requests asking for visitation" that were explicitly denied by the Department. *Id.* at 633. The Fort Worth Court of Appeals held

14

that a parent's proactive but thwarted efforts to obtain visitation should be considered in the abandonment analysis. *Id.*

*In re D.T.* is not applicable here because the record contains no indication that visitation was beyond Father's control. *See In re A.G.N.*, No. 06-22-00002-CV, 2022 WL 1493030, at *5 (Tex. App.—Texarkana May 12, 2022, no pet.) (mem. op.) (holding that visiting the child is within the parent's control even though a no-contact order was established because the parent could have complied with the court's orders and then requested visitation from the court); *In re G.M.M.*, 721 S.W.3d at 684 (holding that the trial court improperly terminated mother's parental rights because she attended all virtual visitations prior to incarceration and, once she found out about the no contact order upon incarceration, mother wrote twenty-five "appropriate, loving, and positive letters" to the child in the nine months before trial).

Here, Adame and Sulsar both testified that A.M. had no meaningful relationship with Father, had seen him only a handful of times, and had spoken with him only a few times by telephone. Father had not attempted any contact with A.M. for at least eight months before his trial, and he did not pursue even minimal efforts, such as letters or regular communication with Adame, to maintain a relationship with A.M. while incarcerated. Father made no requests to contact A.M. through the Department. Father asked only his mother and another one of his daughters about contacting A.M., and he stated they advised him they were "not even allow[ed] . . . to have contact with her." Father called Adame once stating that he expected to be released soon, and said that he wanted to work services, but he remained incarcerated at his trial, with a projected release date in June 2026. Nothing indicates that Father's mother or other daughter

15

had authority over visitation with A.M. or that the Department or the trial court actually barred him from writing or otherwise contacting A.M.

The trial court could have reasonably concluded that it was unreasonable for Father to rely on those statements made by his mother and his other daughter. His failure to take minimal steps, such as writing letters, consistently contacting Adame to inquire about permissible communication, or seeking clarification from the trial court, demonstrates a lack of significant contact that is not excused by any genuine obstacle to establishing a bond with A.M. *See In re M.R.J.M.*, 280 S.W.3d 494, 506 (Tex. App.—Fort Worth 2009, no pet.) (holding that two visits and three letters were not enough).

Because Father failed to maintain contact despite having the legal ability to do so, a reasonable fact-finder could form a firm belief or conviction that he did not regularly visit or maintain significant contact with A.M. and that he demonstrated an inability to provide a safe environment for her. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N).

Given these circumstances, including Father's pervasive criminal history, which repeatedly caused his absence from A.M.'s life, a reasonable fact-finder could form a firm belief or conviction that Father constructively abandoned A.M. within the meaning of ground N. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N); *In re J.F.-G.*, 627 S.W.3d at 312–16. After an exacting review of the entire record, under the legal and factual review principles set forth above, and with a healthy regard for the constitutional interests at stake, we find that the trial court could have reasonably formed a firm belief or conviction that termination of Father's parental rights on ground N was warranted. *See In re J.F.C.*, 96 S.W.3d at 266. Regarding factual sufficiency, the

16

disputed evidence contrary to the ground N finding is not so significant that the trial court could not have reasonably formed a firm belief or conviction that termination of Father's parental rights was warranted. *See id.* at 266–67. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's ground N finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N).

We overrule Father's second issue.

## V. Mother's Parental Rights Termination Is in A.M.'s Best Interests

In her sole issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that her parental rights termination is in A.M.'s best interests.

### A. Applicable Law

"In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), we gave a *nonexhaustive* list of factors that should be considered when determining the best interest of a child." *In re A.A.*, 670 S.W.3d 520, 534 n.57 (Tex. 2023) (emphasis added). The listed factors are:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) their plans for the child; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Id.* (citing *Holley*, 544 S.W.2d at 372).

"[T]he inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest . . . ." *In re C.H.*, 89 S.W.3d at 28.

17

In other words, the *Holley* factors are not a checklist.

> [W]e have never held that these considerations are exhaustive, or that *all* such considerations must be proved as a condition precedent to parental termination. The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child. Other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to uphold the jury's finding that termination is required.

*Id.* at 27. Consequently, the fact-finder may choose to give greater weight to one factor over others. *Id.* (upholding the trial court's finding that termination was in the child's best interests where five *Holley* factors were "lacking" in the view of the court of appeals, but there was "undisputed" evidence of the father's "historical deficiencies in parenting and current criminal proclivities").

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re R.G.*, 2024 WL 4142842, at *6 (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.)). "When considering the child's best interest[s], we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *Id.* (alteration in original) (quoting *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet denied) (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.))). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest[s]." *Id.* (alteration in original) (quoting *In re M.C.*, 482 S.W.3d at 688) (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth

2007, no pet.))). "[W]e may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis." *Id.* (citing *In re C.H.*, 89 S.W.3d at 28).

Even when the evidence supports termination on endangerment grounds, the outcome of the best-interest inquiry is not a foregone conclusion. *See In re R.R.A.*, 687 S.W.3d at 281. In *In re R.R.A.*, the Texas Supreme Court upheld termination on endangerment grounds, but then held, "[w]hether [the parent's] bond with the child[] warrants further work toward reunification is most appropriately addressed in a best-interest determination." *Id.* However, though proof of statutory-termination grounds "does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28; *see In re J.W.*, 645 S.W.3d at 747–48.

## B.     Analysis

Under the first *Holley* factor (the child's desires), A.M. expressed that "if her parents' rights were terminated that's on [Father and Mother]," and she stated that she wanted to be adopted. Sulsar testified that A.M. was doing well at the time of trial and that her physical needs were being met in her then-current placement at trial. That evidence supports the trial court's best-interest finding.

The second and third *Holley* factors address A.M.'s emotional and physical needs and the emotional and physical dangers to her now and in the future. Mother has no bond with A.M., had been largely absent from her life, and remained incarcerated at the time of Mother's trial with a projected release in 2032, when A.M. would be near the age of majority. Mother's criminal conduct, repeated incarcerations, and drug addiction prevented her from meeting A.M.'s

19

needs at any time in A.M.'s life, and Mother made no meaningful progress toward doing so. Sulsar testified that A.M.'s reunification with Mother would not be safe. Near the end of the case, after roughly ten months without contact, Mother wrote three letters to A.M. The trial court could have considered those letters yet reasonably determined that they did not overcome Mother's longstanding absence, drug use, and criminal history. This evidence supports the trial court's best-interest finding.

As for the fourth *Holley* factor (the parental abilities of the person seeking custody), Mother has never meaningfully parented A.M., has no bond with her, and would be incarcerated for at least nineteen months after the conclusion of Mother's trial in this matter, with a projected release in 2032. She has not provided support or a placement for A.M. *See In re B.B.*, No. 06-24-00047-CV, 2024 WL 4448690, at *6 (Tex. App.—Texarkana Oct. 9, 2024, no pet.) (mem. op.) (considering "past ability to care for her child[] as an indicator of future actions"). This evidence supports the trial court's best-interest finding.

The fifth *Holley* factor looks at programs available to assist the person seeking custody. Mother did not make significant progress under her FSP. She has a history of drug abuse, with evidence that she used drugs throughout A.M.'s life. The record contains no evidence that Mother took steps to address her drug addiction. This factor supports the trial court's best-interest finding.

The sixth and seventh *Holley* factors address Mother's plans for A.M. and the stability of any proposed placement. Mother had no concrete plan for where A.M. would live upon Mother's release and did not identify a suitable placement with relatives or others. She did

transfer units to complete cosmetology classes to improve Mother's future employability, but that did not translate into a realistic plan for A.M.'s housing, schooling, or support. On the other hand, although A.M. was in a residential treatment facility, the trial court could have determined that she was improving and stable. This factor supports the trial court's best-interest finding.

The eighth *Holley* factor examines whether the existing parent-child relationship is proper. Mother testified that her life has been "up and down in drug addiction," and the record reflects that she has spent much of A.M.'s life incarcerated. A.M. does not have a bond with Mother. This factor supports the trial court's best-interest finding.

The ninth *Holley* factor concerns any excuse for Mother's acts or omissions. The record does not reflect a legitimate excuse for her failure to establish or maintain a bond with A.M. or to provide parental support. Although "[a] parent's lack of education, training, or misfortune [may be] considered," those circumstances "do not negate evidence . . . that termination is in the child's best interest." *Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.). This factor supports the trial court's best-interest finding.

After an exacting review of the entire record, under the legal and factual review principles set forth above, and with a healthy regard for the constitutional interests at stake, we find that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights is in A.M.'s best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Supp.); *In re J.F.C.*, 96 S.W.3d at 266. Regarding factual sufficiency, the disputed evidence contrary to the best-interest finding is not so significant that the trial court

21

could not have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in A.M.'s best interests. *See id.* at 266–67. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

We overrule Mother's sole issue.

## VI.     Conclusion

We affirm the trial court's order terminating Father and Mother's parental rights.

Jeff Rambin
Justice

Date Submitted:     April 7, 2026
Date Decided:       April 30, 2026

22